were executed. Barnes occupied the farm under the first lease until the end of the term, and began to occupy under the second lease. Clark brought summary proceedings to recover possession upon the ground that the two leases were to be construed together, and were void. It was held at general term that the leases were good for 12 years, and void only for the excess; but this judgment was reversed by the court of appeals, which held that a lease of agricultural lands for a longer period than 12 years, by which rent was reserved, was absolutely void. In the case cited the lessee had surrendered a lease for lives in consideration of these leases for years, had occupied and improved the farm, but nevertheless it was held that, the lease being void under the constitution, it could be repudiated by the lessor.

The judgment should be reversed, and a new trial granted, with costs to abide the event.

ADAMS, J., concurs.

---

(19 App. Div. 35.)

BUFFALO DOCK CO. v. LADENBURG et al.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1897.)

**1. WHARFINGERS—STORAGE CHARGES.**
  A dock company, which customarily received ore for transshipment, storing it for a reasonable time without charge, received a total of over 30,000 tons of ore from one shipper in the fall of 1891 and in 1892, more than half of which was allowed to remain till 1893. In March, 1893, the company notified the shipper that unless the ore were removed by June 1, 1893, a storage charge of three cents a month per ton would be made. *Held*, that a reasonable storage charge from that date was recoverable.

**2. SAME—REASONABLENESS.**
  Also, *held*, that three cents per month was excessive, but that fifteen cents a year was a reasonable charge.

**3. SAME—LIEN FOR CHARGES.**
  Also, *held*, that the company became a bailee for hire on June 1, 1893, and had a lien on the ore for payment of the storage charges.

Appeal from special term, Erie county.

Action by the Buffalo Dock Company against Adolph Ladenburg and others to enforce a lien. From a judgment for plaintiff, defendants appeal. Affirmed.

The following is the opinion of Mr. Justice SPRING, at special term:

Corrigan, Ives & Co., in 1891, and thereafter, were shippers and vendors of iron ore, with their principal place of business at Cleveland, Ohio. This ore was taken from the mines in the Lake Superior region, and shipped by boat to the various lake ports, and in the main transshipped by rail to the purchasers or consumers. The plaintiff was the owner of a dock in the city of Buffalo, and the ore received by it was either immediately transferred from the boats to the cars, or was stored to await the convenience of the shippers. The compensation to the plaintiff consisted of from twelve to sixteen cents per ton paid for unloading from the boats, and about twenty cents per ton for loading on board the cars. The storage of the ore on its dock was a mere incident to the traffic, and, in the regular order of business, was not accompanied with any specific recompense, as the storage was necessary for the proper carrying on of the business of transshipment. May 29, 1891, the plain-

tiff received a letter from Corrigan, Ives & Co. stating they desired to place on the dock of the plaintiff 20,000 tons of ore. In reply to this the plaintiff, in a letter under date of May 29, 1891, informed these defendants it was willing to receive the ore, but should expect shipping orders for two-thirds of it directly from the boats to the cars, and the remaining one-third would be stored without charge until the opening of navigation in the spring of 1892, when a charge at the rate of fifteen cents per ton per year would be made, and also a like toll for any excess of one-third stored during the season. The defendants promptly declined to accept these terms, which they characterized as "very stringent and arbitrary," and the negotiations were dropped, and the ore was not shipped. Mr. Hart was the president and a large stockholder of the plaintiff, but gave no personal attention to the details of the business. He was a buyer of ore, residing in Philadelphia, and has since died. Mr. Corrigan testified he had a conversation with Mr. Hart, in which Mr. Hart said, in substance, that no charge would be made for the storage of the ore at plaintiff's dock, but that the same rules which were in vogue at other Lake Erie ports would control in its dealings with Corrigan, Ives & Co. It is a strong circumstance urged in discredit of this testimony that during the correspondence relative to the right of plaintiff to charge for storage no allusion is made by the defendants to this important conversation, if relied upon by the defendants to relieve them from liability, although Mr. Corrigan seems to have been cognizant of this controversy. In any event, Corrigan, Ives & Co. commenced shipping the ore to the dock of the plaintiff in September, 1891, and before the close of lake navigation had unloaded 16,597 tons, and in the year 1892, 13,784 tons, in all 30,381 tons. During the years 1891 and 1892 there were loaded on the cars from this quantity 14,922 tons and 1,420 pounds, leaving still piled on the dock over 15,458 tons, or more than half of that received by plaintiff. There are certain facts connected with the shipment of this ore and of the general custom in the business that do not admit of any serious conflict. In the first place, neither party expected any charge to be made for the storage of this ore. It was not received by the plaintiff on the basis of its letter of May 29, 1891. That is not the ground of its present demand. No contract was made for any charge, and it is not now contended any contractual right existed growing out of that letter, or in the original expectation of the parties that any claim would be made against Corrigan, Ives & Co. for the storage of this ore. But there are certain other propositions to my mind measurably controlling in this case. It is patent it was the intention of all parties to have the transshipment of the ore follow reasonably close its unloading on the plaintiff's dock. That dock was not designed for permanent storage of ore. If so, the basis of all charges would have been for storage of the ore instead of for its transshipment,—for the labor of handling. The dock was a necessity for the temporary piling of the ore, to give an opportunity to the shippers to find purchasers in case none were had when the ore was unloaded. But it was not designed or expected that the bulk of the ore received by the plaintiff would remain piled on its dock during the season or seasons following its receipt. That would make the storage of the ore the principal business of the plaintiff, and the transshipment the incident. Nor does the testimony of the witnesses familiar with the manner of doing this business aid the defendants as to this contention. They agree that the greater per cent. of the ore received at their several docks was transferred directly from the boats to the cars, and the great bulk of that stored was removed before navigation opened in the spring following; so that but little was left over for the ensuing summer, and even then the docks, as a rule, have been owned or operated in the interest of the railroad company whose cars transported the ore. That is, the storage again was merely auxiliary to the chief business of transshipping. While witnesses testified ore has remained on the docks for several years, and without charge being made, it was a small per centum of that originally received by the dock owners. No witness testified that ore had been received by the wharf or dock, and piled there, and allowed to remain, without charge, where the storage seems to have been the chief purpose to which the dock had been appropriated. Here we have an anomalous condition of things. Thirty thousand tons are unloaded by a corporation receiving pay exclusively as transshippers. At the end of a year and a half more than one-half of that ore still

remained piled on the dock. That was not within the contemplation of the parties. Neither party expected any such issue of their dealings as that. Their contract or arrangement, whatever it was, was not made, nor their business commenced, with reference to any such contingency as that presented by the continued occupancy of the dock space by this ore. As I have stated, the letters passing between the parties in May, 1891, are not important in determining the contract or method of carrying on the business, but they are cogent and significant in one or two other respects. They do imply it was the expectation that the greater part of the ore received would be immediately transferred from the boats to the cars, and that a charge for storage in certain instances and under certain conditions was not without some basis and some merit. That correspondence makes still more pointed the fact that the plaintiff was not storing ore as a business, but was transshipping it. These facts, therefore, may be held to be established: (1) It was not expected that any charge would be made for storage at the inception of the business between the parties. (2) It was expected that the transshipment of the ore would either be made directly from the boats to the cars, or else it would be substantially cleaned up by the opening of navigation succeeding its storage. (3) That the primary business of the plaintiff was to reship the ore, and its compensation was based upon that,—upon the physical labor of handling the ore, —and it was not a storer of ore, except as an auxiliary to its main business. It is very obvious, with these facts for a foundation, that the testimony as to the custom under widely variant circumstances furnishes no rule to guide us in ascertaining the rights of the parties. With this ore taking up its valuable dock space, and knowing such a prolonged use was not within the original design of the parties, the plaintiff, in March, 1893, notified the shippers that the ore must be removed before June 1st, or a storage charge of three cents per ton per month would be imposed after that date. In so doing the plaintiff did not infringe on any principle inherent in the original understanding, for the condition then existing, as I have stated, was not provided for or foreseen. This new situation confronting the plaintiff justified measures for the removal of the ore, or the imposition of a charge in case it remained after reasonable notice to remove. It is not reasonable to suppose the plaintiff was powerless to act under the changed circumstances. If the contention of the defendants is correct, then the plaintiff could never make any charge unless, perhaps, the defendants were grossly negligent. The situation must receive a fair construction. The defendants could not be made liable summarily. It was incumbent upon the plaintiff to give fair notice of its intention to charge, and, upon that being done, the right to exact it followed. The plaintiff's entire dock space might have been appropriated for years, to the exclusion of any business whatever, if the position contended for on behalf of defendants is correct, and still without any remuneration. Such a rule is too drastic and unreasonable to be sanctioned by a court of equity. While the case is not free from doubt, I am of the opinion that the omission of the defendants to remove the ore within the time designated made them liable for storage charges. The time given seems to have been reasonable. It was some time after the opening of navigation, so that the plaintiff could use its dock space while ore was arriving.

This is a suit in equity to establish a lien upon the ore for the storage charges alleged to be due the plaintiff. The defendants' counsel urge, with much persistence, that in no event is the ore subject to a lien in favor of the plaintiff. That no lien exists by statute is conceded, and that there is none by express agreement; and it is also insisted that, in order to make the common-law lien attach, its vitality and force must be operative from the date of the delivery of the goods. There was no lien perforce the commencement of the receipt of the ore, for its continued storage was not anticipated, and hence no storage charges were contemplated. The failure of defendants to remove the ore, after reasonable notice, gave rise to a new condition of affairs; and when the plaintiff, on March 6th, notified the defendants that a storage charge would be imposed in case the ore was not removed by June 1st, its relation to the ore and to the defendants changed after the designated period. It then became a wharfinger or bailee for hire. If it was correct in its position, it had a right to charge for storage after June 1st. Then upon that date

there was the inception of a new relation, in effect a redelivery of the ore to it. The lien was not effective from the first shipment of the ore, for liability for payment did not commence then. The beginning of the charge and of the attaching of the lien were simultaneous events. The plaintiff asserted its right to charge for storing the ore. The defendants disputed this. The question of the indebtedness hinged on the result of this controversy, and on the same pivot revolved the subsidiary proposition, the right of lien. If the notice to remove was reasonable in point of time, if plaintiff was within the compass of its rights in imposing the storage charges after June 1st, then, as a wharfinger or bailee for hire, it was entitled to enforce a lien upon the ore for its fair charges. Hartley v. Hitchcock, 1 Starkie, 408. As Story says in his work on Bailments (section 452): "A wharfinger, like other depositaries for hire, has a lien on the goods for his wharfage." Again, in section 435: "* * * It has recently been held in America that warehousemen have a specific lien, although they certainly cannot be said by their care and skill to have improved the thing bailed. The same would seem to belong to a wharfinger." See 2 Kent, Comm. 634 et seq.; Edw. Bailm. § 364. The plaintiff's notice to the defendants was that, in case of failure to remove the ore, it would be subjected to a storage charge of three cents per ton per month. The charge it can make is an adequate compensation; and, while the testimony of plaintiff's witnesses on that subject is not controverted, I am satisfied the rate mentioned is excessive. In its original letter, preceding the commencement of business, fifteen cents per ton per year is the price given, and I think that is ample compensation. The defendants, Ladenburg, Thalmann & Co., purchased this ore of the receiver of Corrigan, Ives & Co. with a guaranty that it was free from lien charges for storage, and the decisions and judgments will protect these purchasers as against their vendors. The complaint is somewhat loosely drawn, and fails to state fully the cause of action, but, as the case has been tried on the merits, it may be amended conformably to the facts established.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Adelbert Moot, for appellants.

John G. Milburn, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of SPRING, J., delivered at special term.

---

(20 App. Div. 271.)

In re GRADE CROSSING COMMISSIONERS OF CITY OF BUFFALO.

(Supreme Court, Appellate Division, Fourth Department. July 29, 1897.)

1. RIGHT TO COSTS—WHEN EXISTS.
Indemnity for costs can be had only when provided for by statute.

2. SAME—CONDEMNATION PROCEEDINGS—SPECIAL PROCEEDINGS.
The proceeding of grade crossing commissioners to condemn land for the purpose of widening a street pursuant to Laws 1888, c. 345, is a special proceeding, defined by Code Civ. Proc. § 3334, as any proceeding other than an ordinary prosecution by one party against another.

3. SAME—COSTS—EXTRA ALLOWANCE.
Costs in a special proceeding are limited in amount by Code Civ. Proc. § 3240, to the "rates allowed for similar services in an action in the same court," and do not include anything by way of extra allowance.

4. SAME—CONSTRUCTION OF STATUTES.
Code Civ. Proc. § 3372 (General Condemnation Law), providing for extra allowances of costs, does not apply to a proceeding to condemn land for the purpose of widening a street pursuant to Laws 1888, c. 345 (Grade Crossing Law), which is special in character, and was enacted two years prior to